## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW HAMPSHIRE

Kristyn Graham

     v.                          Civil No. 10-cv-332-JL

Joanne Fortier, Warden,
New Hampshire State Prison
for Women et al.[1]


## REPORT AND RECOMMENDATION


Kristyn Graham brings this civil rights action pursuant to 42 U.S.C. § 1983, asserting that defendants have violated a number of her federal constitutional rights (doc. no. 1), and that defendants are liable to her under state tort law.  Because Graham is a prisoner proceeding pro se and in forma pauperis, the matter is before me for preliminary review to determine, among other things, whether the complaint states any claim upon which relief might be granted.  See 28 U.S.C. § 1915A; United States District Court for the District of New Hampshire Local Rule ("LR") 4.3(d)(2).

---

[1]In addition to Joanne Fortier, Graham has named, as defendants: Dr. John Eppolito, New Hampshire Department of Corrections ("DOC") physician; New Hampshire State Prison for Women ("NHSPW") Nurse Jean Chapman; NHSPW Classification Officer Edmund Hucks; NHSPW physician Dr. Marni Nicholas; and NHSPW Substance Abuse Counselor Kristy Moen.

Standard of Review

Under this Court's local rules, when an incarcerated person commences an action pro se and in forma pauperis, the Magistrate Judge conducts a preliminary review.  LR 4.3(d)(2).  In conducting the preliminary review, the Court construes all of the factual assertions in the pro se pleadings liberally, however inartfully pleaded.  See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (following Estelle v. Gamble, 429 U.S. 97, 106 (1976), to construe pro se pleadings liberally in favor of the pro se party).  "The policy behind affording pro se plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the correct cause of action, even if it was imperfectly pled."  Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997); see also Castro v. United States, 540 U.S. 375, 381 (2003) (courts may construe pro se pleadings to avoid inappropriately stringent rules and unnecessary dismissals).  This review ensures that pro se pleadings are given fair and meaningful consideration.

To determine if a pro se complaint states any claim upon which relief could be granted, the Court must consider whether the complaint, construed liberally, Erickson, 551 U.S. at 94, "contain[s] sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'"
Ashcroft v. Iqbal, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949
(2009) (citation omitted).  "A claim has facial plausibility
when the plaintiff pleads factual content that allows the court
to draw the reasonable inference that the defendant is liable
for the misconduct alleged."  Id.  Inferences reasonably drawn
from the plaintiff's factual allegations must be accepted as
true, but the Court is not bound to credit legal conclusions,
labels, or naked assertions, "devoid of 'further factual
enhancement.'"  Id.  (citation omitted).  Determining if a
complaint sufficiently states such a claim for relief is a
"context-specific task that requires the reviewing court to draw
on its judicial experience and common sense."  Id. at 1950
(citation omitted).

Background

Medical Care, Disciplinary Infraction and Classification Issues

Graham has been an inmate at the New Hampshire State Prison
for Women ("NHSPW") since June 2009.[2]  Graham alleges that she
arrived at the prison with known urinary tract difficulties and

---

[2]Graham was an inmate at the NHSPW facility in Goffstown, New
Hampshire, at the time she filed the complaint in this matter.
According to correspondence from Graham dated October 13, 2010,
she is now housed at the NHSPW's Shea Farm Halfway House.

diagnosis of nephrotoxicity.[3]  Graham was also taking two
medications for her urinary tract issues.  The NHSPW medical
staff was aware of her condition and diagnosis at the time she
arrived at the prison.  Graham also received treatment at the
NHSPW for her urinary tract problems during a previous
incarceration.

NHSPW physician Marni Nicholas continued Graham's previous
medications and also provided her with additional medication for
inflammation and pain.  Graham, until May 2010, refused narcotic
medications that were offered to her, in part because she is a
drug addict in recovery.  Graham was not prescribed ibuprofen
because it is contraindicated for someone with her bladder and
urinary tract issues.

During the four months between January 2010 and May 2010,
the NHSPW Medical Staff performed at least fifteen cultures of
Graham's urine, all of which were abnormal.  Graham's diagnosis
during this time was interstitial cystitis, a chronic incurable
bladder disease.

Because her urine culture results had not improved by May
2010, and because Graham continued to complain to medical staff

---

[3]Nephrotoxicity is the quality or state of being "damaging or
deleterious to the kidney."  MedicineNet.com,
http://www.medterms.com (last visited Nov. 4, 2010).

of bladder problems, Dr. Nicholas, suspecting that Graham may have undiagnosed urinary tract issues, referred Graham for a CT scan.  Graham had a CT scan in early May 2010 at Catholic Medical Center.  The CT scan revealed that Graham had a kidney stone lodged in one of her ureters, causing blood in her urine and pain.  Dr. Nicholas told Graham several days after the scan that the stone was most likely about to pass and prescribed a three-day course of Vicodin, a narcotic, for pain.

On May 15, 2010, Graham's Vicodin prescription had expired. Graham went to sick call and saw NHSPW Head Nurse Dan Belligeron.  Graham told Belligeron that she had not passed the kidney stone yet, and that she needed more pain medication. Belligeron agreed to call Dr. John Eppolito, the on-call physician.  Dr. Eppolito opted not to prescribe additional pain medication for Graham.

Graham states that without pain medication, she "suffered greatly."  On May 17, 2010, Graham went to sick call and saw Nurse Jean Chapman.  Chapman told Graham that she didn't believe that Graham had not yet passed the stone and accused Graham of lying about her continuing pain.  Chapman refused to call the on-call doctor, make an appointment with Dr. Nicholas, or provide Graham with ibuprofen.

Graham felt that because she could not get pain relief medication from the NHSPW medical staff, she had no recourse but to self-medicate.  Graham took ibuprofen and naproxen that had not been prescribed for her.  She was caught by prison officials and charged with a major disciplinary infraction for introducing drugs into the prison.  Graham was taken out of the 28-day drug rehabilitation program she was involved in and moved to the maximum security unit at the NHSPW on Pending Administrative Review ("PAR") status.  While she was housed in maximum security on PAR status, she received no medication for pain, and was not able to see a doctor, although her pain symptoms persisted. Graham lost her slot in the 28-day drug program and was also reclassified as a "C-4" inmate.[4]  After Graham's disciplinary hearing, she received a sanction of one hundred hours of extra duty and one hundred days loss of recreation time.

On May 21, 2010, Graham saw Dr. Nicholas.  Dr. Nicholas apologized for Graham's May 17 interaction with the medical staff.  Dr. Nicholas stated that protocol had not been followed, and that he, as the treating physician, should have been called regarding Graham's request for pain medication.  Dr. Nicholas

---

[4]Inmates in the New Hampshire Department of Corrections are classified on a C-1 to C-5 scale, with C-1 being community-based, C-2 being minimum security, C-3 being medium security, C-4 being closed custody, and C-5 being maximum security.

renewed Graham's Vicodin prescription and agreed to have Graham placed in the next available 28-day program slot.  At the time of filing this action, Graham had not been returned to the 28-day program.

Also on May 21, 2010, Graham was taken to see Dr. Mary Fitzpatrick, a urologist at Elliott Hospital, for an examination and x-ray.  The x-ray revealed that the kidney stone was still lodged in Graham's ureter.  Dr. Fitzpatrick prescribed a drug that would help the stone pass and said that if the stone did not pass in two weeks, Graham would need surgery to remove it. Dr. Fitzpatrick also told Graham that she did not have interstitial cystitis.  Graham eventually passed the stone with no further medical intervention.

As a result of her disciplinary infraction and reclassification to C-4 status, Graham was placed in the Closed Custody Unit ("CCU") at the prison, a unit where violent inmates are housed.  Graham's return to a 28-day substance abuse treatment program was delayed by her disciplinary issues and reclassification.

Graham states that prison regulations entitle her to notice 48 hours prior to a reclassification hearing.  Graham states that she was given notice on May 24, 2010, of a classification

hearing held on May 26, 2010.  Graham claims, however, that the May 26 hearing was a sham, as the reclassification decision was secretly made on May 21, 2010, by prison staff prior to the date of the hearing.  Graham drew this conclusion because, she states, her offender records show that on May 21, 2010, she was classified as a C-4 inmate.  Therefore, Graham asserts, she was not actually afforded 48 hours notice.

Graham also states that there are criteria that must be met in order to classify an inmate as C-4.  Without specifying what those criteria are, Graham states in her complaint that she did not meet the criteria.  Graham also states that other inmates with disciplinary records similar to hers were not placed on C-4 status.

Graham asserts that she was scheduled to be reclassified to a lower security status on July 21, 2010.  Graham states that reclassification hurt her chance of being granted parole, as her parole hearing was scheduled on July 20, 2010, and she had to attend the hearing as a C-4 inmate.  Because Graham's complaint was filed on July 21, 2010, it is unclear whether or when she was reclassified.[5]

---

[5]This Court received a change of address from Graham dated October 13, 2010, listing her address as the NHSPW Shea Farm

Retaliation Claim

Graham has previously filed a lawsuit in this Court naming as defendants, among others, Chapman and Fortier, who are named as defendants here.  See Graham v. Warden, N.H. State Prison for Women et al., Civ. No. 07-cv-295-PB (Complaint filed Sept. 18, 2007).  Graham states that she has also pursued administrative and legal action against DOC officials arising out of her sexual relationship with a DOC staff member.[6]  Graham asserts that she was heavily sanctioned for her disciplinary infraction, reclassified to C-4, delayed in receiving substance abuse treatment, and denied pain medication on May 17, 2010, in retaliation for her prior lawsuits.  As evidence of retaliation, Graham states that she was given a fabricated reason for the delay in returning her to treatment.  Additionally, Graham asserts that although she has provided "valuable information" to prison staff about a possible homicide, Fortier has failed to recognize Graham's assistance in that matter.

---

Halfway House for women.  It appears, therefore, that Graham was reclassified to C-2 or C-1 status on or before that date.

[6]Graham does not state where the lawsuit regarding the sexual relationship was filed.  There is no record in this Court of any lawsuit regarding a sexual relationship with a DOC staff member except to the extent the matter is mentioned in the instant complaint.

9

Religious Practice Issues

Graham states that she is a member of the Hope Tabernacle, a Christian religious practice.  In the CCU, where Graham was held beginning in May 2010, apparently until the time she filed this action, inmates are not allowed to leave the unit for programming after 6:00 p.m.  The Hope Tabernacle services meet only on Sunday evenings, and she was therefore not permitted to attend.  Graham further states that she was denied a spiritually-based Alcoholics Anonymous ("AA") program called Breaking the Chains, because it is held only on Tuesday evenings.  Graham states that she does not agree with the regular AA programming, which is all that is available to CCU inmates.  Even if Graham were willing to attend the regular AA meeting, the only AA meeting available to CCU inmates is on Saturday morning and conflicts with her scheduled visitation, when her daughter comes to see her.

Conditions of Confinement and Other Issues

Graham states that her housing unit has inadequate ventilation.  Graham states that the doors are closed on CCU twenty-two hours per day; the room is hot; the windows in the cells don't open; and the air ducts on the unit are blocked.

Graham complains that there is no Minimum Security Unit on
the grounds of the NHSPW, as there is on the grounds of the New
Hampshire State Prison for Men.  The men have a C-2 unit on the
grounds of the prison that provides inmates with the opportunity
to leave the prison grounds for supervised jobs.  The men's
prison also has two halfway houses for C-1 inmates.  C-2 inmates
at the NHSPW are housed together in a dorm and do not have off-
ground work opportunities as the men do.  Graham claims this
lack of opportunity denies female inmates an opportunity to
advance themselves within the prison and within the parole
system on a par with men.  Graham states that the Shea Farm
halfway house is the only off-grounds minimum security unit for
women, and both C-2 and C-1 inmates can be placed there.

## The Claims

The complaint, liberally construed, raises the following
claims for relief[7]:

     1.   Graham's Eighth Amendment right to adequate
medical care was violated when:
       a.   Defendant Dr. Nicholas improperly
       diagnosed her with a disease she did not have,

---

[7]The claims, as identified herein, will be considered to be the
claims raised in the complaint for all purposes.  If Graham
disagrees with the claims as identified, she must do so by
properly objecting to this Report and Recommendation or properly
moving to amend her complaint.

and failed to diagnose her kidney stone, causing
Graham to suffer pain.

b.   Defendant Dr. Eppolito denied Graham
pain medication on May 15, 2010.

c.   Defendant Nurse Chapman denied Graham
pain medication on May 17, 2010.

d.   Graham was not provided with any pain
medication or access to a doctor for several days
while she was in maximum security in May 2010,
causing her to suffer pain.

2.   Graham's Fourteenth Amendment due process
rights were violated when she was given harsh
sanctions for a disciplinary infraction.

3.   Graham's asserted right to rehabilitation
was violated when:

a.   she was improperly prevented from
entering a 28-day drug treatment program until
eleven months after she arrived at the NHSPW;

b.   she was removed from a 28-day drug
treatment program as the result of a disciplinary
charge; and

c.   she was denied access to Alcoholics
Anonymous meetings because they conflicted with
her visitation with her daughter.

4.   NHSPW Classifications Officer Edmund Hucks
violated Graham's Fourteenth Amendment due process
rights when:

a.   he improperly classified her to C-4
status when she did not meet criteria for that
status;

b.   he denied her proper notice prior to
her reclassification; and

c.   he hurt her chance to be granted parole
at her July 20, 2010 parole hearing by forcing
her to attend the hearing as a C-4 inmate.

5.   Graham's Eighth Amendment right not to be
housed in inhumane conditions of confinement and her
right to be protected from harm were violated when:

a.   she was placed in the Closed Custody
Unit, where violent inmates are also housed; and

b.   she was placed in the Closed Custody
Unit without adequate ventilation.

6.   Defendants Fortier and Chapman took adverse
actions against Graham in retaliation for prior
lawsuits she has filed against them and other
individuals who work in the prison.

7.   Graham's First Amendment rights and rights
under the Religious Land Use and Institutionalized
Persons Act, 42 U.S.C. § 2000cc-1(a) ("RLUIPA") were
violated when:
a.   Denial of CCU inmates' access to
evening programming deprived her of the ability
to attend religious services; and
b.   she was denied access to a spiritually-
based Alcoholics Anonymous rehabilitation program
because it met after 6:00 p.m.

8.   Graham's Fourteenth Amendment right to equal
protection was violated because male inmates housed at
the New Hampshire State Prison for Men have access to
certain job and housing opportunities not available to
female inmates at the NHSPW.

9.   Defendants are liable to her under state law
for medical malpractice and the intentional infliction
of emotional distress.

<u>Discussion</u>

I.   <u>Section 1983</u>

Section 1983 creates a cause of action against those who,

acting under color of state law, violate federal constitutional

or statutory law.   <u>See</u> 42 U.S.C. § 1983[8]; <u>City of Okla. City v.</u>

---

[8]42 U.S.C. § 1983 provides that:

<u>Tuttle</u>, 471 U.S. 808, 829 (1985); <u>Wilson v. Town of Mendon</u>, 294 F.3d 1, 6 (1st Cir. 2002).  In order for a defendant to be held liable under § 1983, his or her conduct must have caused the alleged constitutional or statutory deprivation.  <u>See</u> <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 692 (1978); <u>Soto v. Flores</u>, 103 F.3d 1056, 1061-62 (1st Cir. 1997).  Here, Graham claims that the defendants, all state actors, have violated rights accruing to her under federal law.  As such, her claims arise under § 1983.

II.  <u>Inadequate Medical Care</u>

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  <u>Helling v. McKinney</u>, 509 U.S. 25, 31 (1993); <u>Giroux v. Somerset Cnty.</u>, 178 F.3d 28, 31 (1st Cir. 1999).  The pertinent Eighth Amendment prohibition on cruel and unusual punishment applies to the states through the Due Process

---

Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

Clause of the Fourteenth Amendment.  See Robinson v. California,
370 U.S. 660, 666-67 (1962).

The Supreme Court has adopted a two-part test for reviewing
medical care claims under the Eighth Amendment.  See Farmer v.
Brennan, 511 U.S. 825, 834 (1994).  A court must first determine
if the prisoner has alleged facts sufficient to show that he or
she has not been provided with adequate care for a "serious
medical need."  Id.  Second, the court must determine if the
complaint contains sufficient allegations to show deliberate
indifference.  See id.  Allegations that simply show
"substandard care, malpractice, negligence, inadvertent failure
to provide care, and disagreement as to the appropriate course
of treatment are all insufficient to prove a constitutional
violation."  Ruiz-Rosa v. Rullan, 485 F.3d 150, 156 (1st Cir.
2007).

A serious medical need is one that involves a substantial
risk of serious harm to the prisoner if it is not adequately
treated.  See Barrett v. Coplan, 292 F. Supp. 2d 281, 285
(D.N.H. 2003); see also Gaudreault v. Municipality of Salem, 923
F.2d 203, 208 (1st Cir. 1990) (defining serious medical need as
one "that has been diagnosed by a physician as mandating

15

treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention"). To be found deliberately indifferent, a prison official subjectively must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must also draw the inference.  See Farmer, 511 U.S. at 837.  Deliberate indifference "may be shown by the denial of needed care as punishment and by decisions about medical care made recklessly with 'actual knowledge of impending harm, easily preventable.'"  Ruiz-Rosa, 485 F.3d at 156 (citation omitted).  "In order to establish deliberate indifference, the complainant must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain." Braga v. Hodgson, 605 F.3d 58, 61 (1st Cir. 2010) (internal citation and quotations omitted).  Deliberate indifference may be found "in wanton decisions to deny or delay care, where the action is reckless, not in the tort law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge of impending harm, easily preventable." Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993) (internal citation and quotations omitted).  Deliberate indifference is not demonstrated by an inmate's disagreement with his treatment, by

16

an allegation that better treatment than what was provided is available, or by a difference of opinion among medical professionals regarding diagnosis and treatment.  See Feeney v. Corr. Med. Servs., 464 F.3d 158, 162 (1st Cir. 2006) ("When a plaintiff's allegations simply reflect a disagreement on the appropriate course of treatment, such a dispute with an exercise of professional judgment may present a colorable claim of negligence, but it falls short of alleging a constitutional violation" (internal citations omitted)).

    A.   Serious Medical Need

Here, Graham has alleged that she has suffered from kidney stones and other urinary tract problems that cause a great deal of pain and require medication to treat both the pain and the underlying issues.  These facts show that she suffers from a serious medical need, i.e., severe pain, kidney stones, nephrotoxicity, and urinary tract problems.  For purposes of preliminary review, Graham's statements that she suffers from these conditions suffice to allege a serious medical need requiring the attention of prison officials.

    B.   Deliberate Indifference

Graham alleges that between May 15 and May 21, 2010, she did not receive pain medication despite suffering from an

unpassed kidney stone and despite notifying prison medical
officials that she needed pain relief.  The critical issue here
is whether the prison's failure to provide Graham with pain
medication during that six-day period constitutes "deliberate
indifference" to her pain, and not "simply . . . a disagreement
on the appropriate course of treatment."  Id.

Graham states that when she came into the prison, she was
on medication which Dr. Nicholas continued.  Dr. Nicholas also
added medication to her regimen.  Graham states that between
January 2010 and May 2010 she received fifteen urine cultures
and monitoring of her urinary tract problems.  Although Graham
states that she spent those four months misdiagnosed, there is
no indication that during that time period her condition or
symptoms were ignored by any NHSPW medical personnel.  Nor is
there any indication that anyone at the NHSPW did anything
deliberately to harm her, or failed to do anything that she
needed with a purpose to cause her to suffer.

At issue here is Dr. Eppolito's May 15 denial of pain
medication, Chapman's May 17 denial of pain medication, and the
denial of pain medication for several days while Graham was
housed in maximum security.  On May 15, 2010, Dr. Eppolito
received a phone call from Nurse Belligeron and made a medical

decision not to provide pain medication to Graham.  There is
nothing in the complaint that suggests that Dr. Eppolito had any
improper motive in denying Graham's request for medication.
Similarly, although Graham alleges that Chapman held a grudge
against her for a prior lawsuit Graham had filed naming Chapman
as a defendant, nothing in Graham's allegations, except her bald
assertion that Chapman was retaliating against her, indicates
that Chapman's decision was not based upon a medical judgment,
or was intended to inflict harm or pain upon Graham.

Graham contends that she was denied access to medical
treatment and pain medication for several days in maximum
security.  Graham concedes that twice in the several days prior
to being admitted to maximum security, medical staff had denied
her pain medication.  In fact, Graham's stay in maximum security
was the result of her taking medication that had not been
prescribed to her, and in fact had been refused her, in the days
prior to the incident.  Graham says she requested pain
medication in maximum security but does not allege any facts
upon which I can find that the failure to provide her with the
medication she requested amounted to deliberate indifference to
her condition.  In fact, Graham's own assertions indicate that
she was given access to a doctor and to pain medication on May

19

21, 2010.  Thus, Graham has alleged no more than that she was denied pain medication for six days.  Graham's allegations state neither a deprivation of constitutional magnitude nor any deliberate indifference on the part of any NHSPW staff member. Accordingly, I recommend that the Eighth Amendment claims alleging the failure to provide adequate medicare care be dismissed.

C.  Misdiagnosis

As previously stated, Graham has alleged that she has a serious medical condition concerning her urinary tract difficulties.  Graham states that because she was misdiagnosed, she did not receive diagnostic testing that would have earlier identified her kidney stone.  Graham states, however, that when she presented herself to the NHSPW medical staff, the staff treated and monitored her symptoms and made a medical judgment, albeit an incorrect one, about their cause.  At some point Dr. Nicholas began to suspect that there was more going on with Graham than interstitial cystitis and promptly sent her for appropriate follow-up testing which successfully identified the root of Graham's pain.  Nothing here suggests that the medical staff did anything unreasonable in diagnosing or treating Graham.  See Estelle, 429 U.S. at 106 ("a complaint that a

physician has been negligent in <u>diagnosing</u> or treating a medical
condition does not state a valid claim of medical mistreatment
under the Eighth Amendment" (emphasis added)); <u>Fenner v. Morgan</u>,
772 F. Supp. 59, 62 (D.R.I. 1991) (incorrect leukemia diagnosis
and treatment pursuant to that diagnosis did not violate Eighth
Amendment where defendants "gave close and particular attention
to the plaintiff's medical needs").  On the facts alleged, I
cannot find that the misdiagnosis of Graham's condition was the
product of deliberate indifference.  Because Graham has failed
to state a violation of the Eighth Amendment for her
misdiagnosis, I recommend that this claim be dismissed.

   D. <u>State Law Claims</u>

  Graham asserts state law claims of medical malpractice and
the intentional infliction of emotional distress relating to the
medical care she received at the prison.  Under 28 U.S.C.
§ 1367(a), the district court has supplemental jurisdiction over
state law claims that arise from the same nucleus of operative
facts.  See <u>Roche v. John Hancock Mut. Life Ins. Co.</u>, 81 F.3d
249, 256 (1st Cir. 1996).  If the court dismisses all claims
over which it has original jurisdiction, or if the state law
claims would substantially predominate over the remaining
federal claims, the court may decline to exercise its

supplemental jurisdiction over those state law claims.  See 28
U.S.C. § 1367(c).

Here, the case is at a preliminary stage.  I have
recommended dismissal of all Eighth Amendment claims relating to
medical care, but not all federal claims in the case.  The
remaining federal claims do not relate to any issues of medical
care; rather, they concern a policy that restricted Graham's
access to religious services, which is unrelated to her state
law claims.  Judicial economy, convenience, and fairness to the
parties would not be served by retaining jurisdiction over those
state law claims at this early stage of the case.  The state law
claims of malpractice and intentional infliction of emotional
distress relating to claimed medical errors could involve
complex factual issues requiring expert medical testimony,
having no relevance to the federal claims remaining in this
case, thereby causing those state law claims to predominate over
the federal claims that remain.  Accordingly, I recommend that
the state law claims be dismissed without prejudice to refiling
in a state court of appropriate jurisdiction.

III. Disciplinary Sanctions

"The Due Process Clause standing alone confers no liberty
interest in freedom from state action taken 'within the sentence

22

imposed.'"  Sandin v. Conner, 515 U.S. 472, 480 (1995) (quoting

Hewitt v. Helms, 459 U.S. 460, 468 (1983)).  A state may under

certain circumstances create liberty interests implicating the

Due Process Clause, but:

> these interests will be generally limited to freedom
> from restraint which, while not exceeding the sentence
> in such an unexpected manner as to give rise to
> protection by the Due Process Clause of its own force
> . . . nonetheless imposes atypical and significant
> hardship on the inmate in relation to the ordinary
> incidents of prison life.

Sandin, 515 U.S. at 483-84 (citing Bd. of Pardons v. Allen, 482

U.S. 369 (1987)).

Graham here asserts that, in response to her disciplinary

infraction for introducing drugs into the prison, she was

harshly sanctioned with 100 hours of extra duty, 100 days loss

of recreation, and a loss of her spot in a 28-day drug

rehabilitation program.  While Graham does not specifically

assert that she was denied due process, I construe her claim to

allege that she had a liberty interest in not receiving the

sanction imposed that was taken from her without adequate

process.  The sanctions she suffered, however, did not increase

her sentence beyond what was imposed by the Court.  The

sanctions Graham describes are not so severe as to constitute an

"atypical and significant hardship in relation to the ordinary

incidents of prison life." Id. at 484; Dominique v. Weld, 73 F.3d 1156, 1159 (1st Cir. 1996). Because Graham cannot assert a liberty interest in avoiding the sanctions she received, I recommend dismissal of Graham's claims that she was denied due process before those sanctions were imposed.

IV. Right to Rehabilitation

Graham alleges that she is entitled to drug rehabilitation. Specifically, Graham asserts a right to attend the drug program in which she was enrolled in May 2010. Graham further asserts that she has been denied access to AA meetings.

The Eighth Amendment does not require that inmates be provided access to rehabilitative programming. See Fiallo v. de Batista, 666 F.2d 729, 731 (1st Cir. 1981); see also Morales Montáñez v. Puerto Rico, No. 08-1945, 2009 WL 1617929, at *5 (D.P.R. May 29, 2009) ("there is no federal constitutional right to rehabilitative training or treatment and as a result there is no violation of [plaintiff's] civil rights based upon such a constitutional right"). Without more, therefore, Graham's assertion that she was denied rehabilitative programming does not state a claim for a violation of any right protected by the constitution. Accordingly, I recommend that the claim be dismissed.

V.   Classification

An inmate does not have any protected liberty interest in
custodial classifications unless state statutes or regulations
create such an interest.  See Moody v. Daggett, 429 U.S. 78, 88
n.9 (1976); Olim v. Wakinekona, 461 U.S. 238, 248-50 (1983); see
also Reid v. Brodeur, Civ. No. 96-492-PB, 2000 WL 1466146, at *2
(D.N.H. Jan. 24, 2000) (holding that inmate had no protected
liberty interest in custodial classifications and therefore
failed to allege a Fourteenth Amendment due process claim for a
deprivation thereof).  New Hampshire law "does not give [an
inmate] a right to any particular custody status and a change in
custody status is not the type of 'atypical and significant
hardship' from which a prisoner is entitled to protection under
the due process clause."  Novosel v. N.H. Parole Bd., No. 01-
446-PB, 2002 WL 31248278, at *1 (D.N.H. Sept. 6, 2002) (citing
Sandin, 515 U.S. at 484).  Accordingly, Graham cannot establish
a protected liberty interest in her classification.

To the extent that Graham claims that her heightened
classification status negatively impacted her parole
eligibility, neither federal nor state law creates any
protectable expectation of parole.  A convicted person has no
constitutional right to be conditionally released before the

25

expiration of a valid sentence.  See Greenholtz v. Inmates of the Neb. Penal & Corr. Complex, 442 U.S. 1, 7 (1979).  A valid conviction, with all its procedural safeguards, extinguishes that liberty right.  Id.; see also Meachum v. Fano, 427 U.S. 215, 215 (1976).  A right to parole under the Due Process Clause exists only if such right is created by state law.  See Sandin, 515 U.S. at 483-84.  There is no state-created liberty interest in parole under New Hampshire law.  See Ainsworth v. Risley, 244 F.3d 209, 216-17 (1st Cir. 2001); Brooker v. Warden, Civ. No. 98-466-JD, 1999 WL 813893, at *2 (D.N.H. June 22, 1999) ("The possibility of parole is not a right to liberty conferred by New Hampshire state law."); Knowles v. Warden, 140 N.H. 387, 389, 666 A.2d 972, 975 (1995).  Parole decisions in New Hampshire are committed to the discretion of the New Hampshire Parole Board. See N.H. Rev. Stat. Ann. § 651-A:6 (providing that New Hampshire Parole Board "may" grant parole to eligible inmates); N.H. Code Admin. R. Ann. Par. 301.02 (parole shall be considered a privilege).  Accordingly, Graham has no liberty interest in being granted parole, and cannot ground a due process claim on the denial of a classification status that might assist her in obtaining parole release.

Graham has failed to allege any liberty interest in reclassification or parole entitling her to due process protections.  Accordingly, I recommend dismissal of Graham's claims alleging that she was unconstitutionally classified as a C-4 inmate and harmed in her attempt to obtain parole.

VI.   Ventilation

In order to successfully allege an Eighth Amendment violation, plaintiff must first plead facts which, if true, establish an objective component -- that a "sufficiently serious" deprivation occurred.  Wilson v. Seiter, 501 U.S. 294, 298 (1991).  Only deprivations which deny "'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation."  Id. at 298 (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981) (routine discomforts are part of the penalty that criminal offenders pay for their offense against society)); see also Hudson v. McMillian, 503 U.S. 1, 9 (1992) ("extreme deprivations are required to make out a condition of confinement claim").  In addition, a subjective element must be shown -- "deliberate indifference" on the part of the official charged with inflicting cruel and unusual punishment.  Wilson, 503 U.S. at 303; see also Helling v. McKinney, 509 U.S. 25, 32-33 (1993).

Graham claims that the CCU lacks ventilation during the twenty-two hours per day when the unit door is closed.  Graham's complaint does not assert that the lack of additional ventilation has caused her any harm aside from discomfort.  This is not the sort of "extreme" deprivation that would trigger the protection of the Eighth Amendment.  Hudson, 503 U.S. at 9. Further, Graham has not identified any individual defendant who was aware that there was any risk of substantial harm that arose from the existing ventilation conditions in the CCU who disregarded that risk.  Graham's complaint fails to allege the "deliberate indifference" necessary to assert an Eighth Amendment claim.  Wilson, 501 U.S. at 303.  Accordingly, I recommend the ventilation claim be dismissed.

VII. Failure to Protect

"A prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  Mosher v. Nelson, 589 F.3d 488, 493 (1st Cir. 2009) (quoting Farmer, 511 U.S. at 828).  Prison officials' duty to protect prisoners encompasses a duty to protect prisoners from violence at the hands of other inmates.  See Mosher, 589 F.3d at 493 (citing Calderón-Ortiz v. LaBoy-Alvarado, 300 F.3d 60, 63-64 (1st Cir. 2002) ("An inmate may sue

a correctional facility under the Eighth Amendment for failure
to afford adequate protection . . . from attack by other
inmates.")).  In order to be deliberately indifferent to a risk
of serious harm to an inmate, a prison official must be "aware
of facts from which the inference could be drawn that a
substantial risk of serious harm exists, and he must also draw
the inference."  Mosher, 589 F.3d at 494 (internal quotation
marks and citation omitted).  "A prisoner . . . need not wait
until he is actually assaulted to obtain relief."  Purvis v.
Ponte, 929 F.2d 822, 825 (1st Cir. 1991).  Inmates need not
identify a specific threat to obtain protection from prison
officials; a claim for deliberate indifference can be maintained
where an inmate alleges that a prison official had knowledge of
facts from which an inference could be drawn that a substantial
risk of serious harm existed, and failed to reasonably respond
to the risk.  See Calderón-Ortiz, 300 F.3d at 36 (deliberate
indifference in connection with protracted assault on inmate
could be shown when officials knew that more dangerous and
vulnerable inmates were housed together and that officials were
not making regular patrols of housing area).  An allegation of
deliberate indifference may be defeated where officials
responded reasonably to a known risk of harm.  Mosher, 589 F.3d

at 494 (citing <u>Burrell v. Hampshire Cnty.</u>, 307 F.3d 1, 8 (1st
Cir. 2002)).

Graham alleges that she was housed in a unit that also
housed violent inmates.  Graham's allegations fall short of
alleging any actual risk or threat to her.  Further, even
presuming that a situation could be imagined where being housed
with violent inmates could constitute, without more, a
substantial risk that she could be harmed, Graham has failed to
allege that any prison official was actually aware of facts
which would enable them to infer an actual risk to her, and also
failed to take reasonable steps to prevent the risk.
Accordingly, I find that Graham has failed to state sufficient
facts to allege an actionable constitutional claim that she was
endangered simply by virtue of her placement on the CCU.

VIII.   <u>Retaliation</u>

To establish a retaliation claim, Graham must allege: (1)
that the conduct which led to the alleged retaliation was
protected by the exercise of a right guaranteed to her by the
federal constitution or other federal law, (2) some adverse
action at the hands of prison officials, and (3) a causal link
between the exercise of her protected right and the adverse
action.  <u>See</u> <u>Price v. Wall</u>, 428 F. Supp. 2d 52, 55 (D.R.I.

30

2006); see also McDonald v. Hall, 610 F.2d 16, 18 (1st Cir. 1979) (discussing pleading requirements for retaliation claims by prisoners).  "[G]overnment actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right."  Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003); see also Oropallo v. Parrish, No. 93-1953, 1994 WL 168519, at *3 (D.N.H. May 5, 1994) (citing Ferranti v. Moran, 618 F.2d 888, 892 n.4 (1st Cir. 1980) ("actions otherwise supportable lose their legitimacy if designed to punish or deter an exercise of constitutional freedoms" (internal citation omitted))).

Graham's retaliation claim falters in her failure to allege facts that support a causal link between the exercise of her First Amendment rights and the adverse acts alleged.  Graham's retaliation claim is asserted with conclusory statements regarding the motivation of Chapman and Fortier.  Graham states that Chapman and Fortier acted against her in retaliation, but points to no specific facts, statements, or circumstances aside from her own belief, supporting that assertion.  Accordingly, I recommend that the retaliation claim be dismissed.

IX.  <u>Religious Practice</u>

   A.   <u>RLUIPA</u>

   RLUIPA provides that:

>    No government shall impose a substantial burden
>    on the religious exercise of a person residing in
>    or confined to an institution, as defined in [42
>    U.S.C. § 1997], even if the burden results from a
>    rule of general applicability, unless the
>    government demonstrates that imposition of the
>    burden on that person (1) is in furtherance of a
>    compelling governmental interest; and (2) is the
>    least restrictive means of furthering that
>    compelling governmental interest.

42 U.S.C. § 2000cc-1(a).[9]  To state a claim under RLUIPA, a

plaintiff must assert that a substantial burden has been placed

on the exercise of his or her religion.  <u>See</u> <u>Crawford v. Clarke</u>,

578 F.3d 39, 43 (1st Cir. 2009).  The First Circuit has not

defined what constitutes a "substantial burden" on the exercise

of religion, but has assumed a prima facie showing of

"substantial burden" was made where a restriction put

"substantial pressure on an adherent to modify his behavior and

to violate his beliefs."  <u>Spratt v. R. I. Dep't of Corrs.</u>, 482

F.3d 33, 38 (1st Cir. 2007) (citing <u>Thomas v. Review Bd. Of Ind.</u>

<u>Emp't Sec. Div.</u>, 450 U.S. 707, 718 (1981) (discussing

---

[9]For purposes of preliminary review, I find that Graham is an
institutionalized person within the meaning of RLUIPA.  <u>See</u> 42
U.S.C. § 1997(1) (including state prisons in the definition of
"institution").

"substantial burden" on the exercise of religion in the context of the First Amendment)).  Once a plaintiff claims a "substantial burden" on his or her religious practice, the burden shifts to the government to demonstrate that the restriction in question furthers a "compelling" government interest and does so by the "least restrictive means" available. See Spratt, 482 F.3d at 38.  Accordingly, to state a claim for relief, Graham need not go so far as to allege the absence of a compelling governmental interest or that the restriction on her practice was not the least restrictive means available to prison officials.  Graham need not allege that the restricted exercise was "central" to the practice of her religion, only that her religious practice was "substantially burdened" by the restriction.

In an unpublished opinion, this Court has held that:

> Although the circuits have split, the better reasoned view is that the "substantial burden" requirement does not turn on the centrality of a particular religious practice to the plaintiff's religion.  To hold otherwise disregards RLUIPA's definition of "religious exercise," which expressly protects practices that are not central to a practitioner's religious beliefs.  Thus, I conclude that a prison policy substantially burdens religious exercise under RLUIPA if it coerces the inmate to modify his religious behavior significantly or to violate his religious beliefs.

Farrow v. Stanley, No. Civ. 02-567-PB, 2005 WL 2672541, *4
(D.N.H. Oct. 20, 2005) (Order denying in part and granting in
part motion for summary judgment).  I will evaluate Graham's
claim applying this view.

Graham states that she was prevented from attending weekly
religious services, and that her inability to attend burdened
the exercise of her religion.  Graham claims that the failure to
attend weekly services is damaging to her relationship with her
"creator" and therefore hampers her religious practice.  I find
that Graham has alleged that a substantial burden was placed on
the exercise of her religion.

I find that Graham has stated sufficient facts to assert a
claim under RLUIPA for the failure to allow her to attend weekly
religious services during her stay in the CCU.  In an Order
issued simultaneously with this Report and Recommendation, I
will direct service of this claim.

B.    Free Exercise Clause

The First Amendment's Free Exercise Clause "requires
government respect for, and noninterference with, the religious
beliefs and practices of our Nation's people."  Cutter v.
Wilkinson, 544 U.S. 709, 719 (2005).  This provision applies to

the states under the Fourteenth Amendment.  See Elk Grove
Unified Sch. Dist. v. Newdow, 542 U.S. 1, 6 n.4 (2004).

"[A] prison inmate retains those First Amendment rights
that are not inconsistent with his status as a prisoner or with
the legitimate penological objectives of the corrections
system," including the right to the free exercise of religion.
Pell v. Procunier, 417 U.S. 817, 822 (1974).  See O'Lone v.
Estate of Shabazz, 482 U.S. 342, 348 (1987) (citing Cruz v.
Beto, 405 U.S. 319, 322 (1972)).  A prisoner's sincerely held
religious beliefs must yield if contrary to prison regulations
that are "reasonably related to legitimate penological
interests."  Turner, 482 U.S. at 89.  A court evaluating a claim
that a prison regulation interfered with an inmate's rights
under the First Amendment's Free Exercise Clause must accord
prison administrators significant deference in defining
legitimate goals for the corrections system, and for determining
the best means of accomplishing those goals.  See Overton v.
Bazzetta, 539 U.S. 126, 132 (2003); Pell, 417 U.S. at 826-27.

A court, in evaluating whether or not a particular prison
regulation is constitutional, considers four factors: (1)
whether the regulation has a "valid, rational connection" to a
legitimate penological objective, (2) "whether any alternative

means are open to inmates to exercise the asserted right," (3)
"what impact an accommodation of the right would have on guards
and inmates and prison resources," and (4) "whether there are
ready alternatives to the regulation."  Overton, 539 U.S. at 132
(citing Turner, 482 U.S. at 89-91).  Here, Graham has alleged
that she cannot participate in a central practice of her
religion – weekly Hope Tabernacle services, which meet only once
a week, at 6:00 p.m. on Sundays – because of prison policies
restricting her ability to leave her unit after 6:00 p.m.
Graham has been denied access to services based on a general
rule, applicable to all Closed Custody inmates, that renders
unavailable any religious service held after 6:00 p.m.  It may
be that the 6:00 p.m. curfew is rationally related to a
legitimate penological interest in managing the movement of
inmates within the institution.  However, Graham has alleged
that she has been afforded no alternative means of exercising
her right to attend religious services because of the curfew.
The complaint does not facially preclude a finding that there is
no reasonable, not unduly burdensome, accommodation that could
be made to allow Graham to attend the once weekly Hope
Tabernacle service the prison offers.  Similarly, it cannot be
determined on the face of the complaint whether or not there is

36

any available alternative means of meeting Graham's religious
needs.  Graham's allegations are therefore sufficient to suggest
that the rule may be an exaggerated response to a legitimate
penological interest, as there may well be less restrictive
means by which such an interest could be carried out.
Accordingly, I conclude that Graham has asserted sufficient
facts to state claims for relief under the First Amendment.

C.   Breaking the Chains

Graham attempts to assert as a violation of her right to
religious freedom her inability to attend a spiritual version of
Alcoholics Anonymous called "Breaking the Chains."  Graham has
not alleged that attending this program is part of her religious
practices, only that she considers it an effective or meaningful
rehabilitative program.  As previously stated, Graham has no
right to rehabilitative programming, see Fiallo, 666 F.2d at
731, and I recommend that her claim based on a denial of access
to the Breaking the Chains program be dismissed.

D.   Supervisory Liability

Graham has not identified a particular defendant whom she
considers liable under RLUIPA and the First Amendment for
preventing her attendance at religious services, apart from the
Warden.  As the NHSPW warden, Fortier cannot be sued under §

37

1983 under a theory of respondeat superior.  See Aponte Matos v. Toledo Davila, 135 F.3d 182, 192 (1st Cir. 1998).  Fortier can be sued in her supervisory capacity, however, where there is an affirmative link between the action complained of and her action or inaction.  See Maldonado v. Fontanes, 568 F.3d 265, 275 (1st Cir. 2009).

Fortier can be presumed to know that inmates in the CCU are not allowed to participate in any off-unit activities at the prison after 6:00 p.m., and can further be presumed to know that this policy entirely restricts CCU inmates from attending religious services in the evening.  Additionally, Graham alleges that she exhausted this claim prior to filing this action, which means that she notified the Warden that the 6:00 p.m. curfew interfered with her religious practices and that she asked the Warden to lift the curfew or otherwise accommodate her religious practices.  The Warden's duty to ensure that prison policies comport with the requirements of federal law, her role in responding as appropriate to grievances, and the inexorable consequence of her failing to redress a grievance relating to a generally applicable policy suffice to show in this case an affirmative link between Fortier's inaction and the RLUIPA and Free Exercise Clause violations.  Accordingly, in an Order

issued this date, I have directed service of those claims on the Warden.

X.   Equal Protection

Graham has alleged that there are certain vocational opportunities available to male minimum security inmates that are not available to female minimum security inmates because the women's prison, unlike the men's prison, does not have off-grounds job opportunities for its minimum security inmates. Graham claims that the existence of this difference violates her right to equal protection of the laws under the Fourteenth Amendment.

"[S]ignificant gender disparity" in the treatment of male and female prisoners, to satisfy the requirements of the Equal Protection Clause, must be based on "an exceedingly persuasive justification for this differing treatment." Ford v. City of Boston, 154 F. Supp. 2d 131, 151 (D. Mass. 2001) (internal quotations and citations omitted).  Before the court can adjudicate this matter, however, "Article III of the United States Constitution requires that there be a case or controversy between the parties." Morales Montáñez, 2009 WL 1617929, at *4 (citing Allen v. Wright, 468 U.S. 737, 750 (1984) (federal courts confined to adjudicating actual cases and controversies)).  This

39

means that, for this Court to be able to decide this matter, there must be "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498, 506 (1972).

Here, Graham asserts a general complaint about the equality of programming found in the men's and women's prisons. Graham does not say that she has been impacted by this disparity of treatment or that she is likely to be. In fact, at the time Graham filed this action, she was a C-4 inmate and the treatment of minimum security inmates had no present bearing on her. Graham did not allege that she had ever, in the past, been damaged by the alleged disparity of treatment or that she had any reason to suspect that she would be in the future.

Further, although she points to a potential difference in procedure in the men's and women's prisons, Graham has not asserted sufficient facts for this Court to be able to infer that the different procedures result in any material difference in treatment of the inmates. For all of these reasons, I recommend that this claim be dismissed.

## Conclusion

In an Order issued simultaneously with this Report and Recommendation, I direct service of Graham's First Amendment and RLUIPA claims against defendant Fortier.  For the reasons explained in this Report and Recommendation, I recommend dismissal of the remaining claims in this action.

Any objections to this Report and Recommendation must be filed within fourteen (14) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauth. Practice of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

_____
Landya B. McCafferty
United States Magistrate Judge

Date:  November 15, 2010

cc:  Kristyn Graham, pro se